## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **DARRYL JORDAN, SHEVON L. YOUNG,** | : | |
| *Plaintiffs,* | : | **C.A. 1:23-cv-** |
| | : | |
| **v.** | : | ***Jury trial demanded*** |
| | : | |
| **CITY OF PROVIDENCE, by and through its** | : | |
| **Acting Treasurer LANCE CARDILLO, SEAN** | : | |
| **MURNIGHAN, alias, MARK CAMERON,** | : | |
| **and JOHN DOES 1-12 individually and in** | : | |
| **their official capacity as Providence Police** | : | |
| **Officers, and STEVEN PARÉ, alias,** | : | |
| **individually, and HUGH T. CLEMENTS,** | : | |
| **alias, individually, and OSCAR PEREZ in his** | : | |
| **official capacity as Chief of Police of the City** | : | |
| **of Providence,** | : | |
| *Defendants* | : | |

## COMPLAINT

## I. Introductory Statement

This action is brought by the Plaintiffs, Darryl Jordan and Shevon L. Young, seeking declaratory and injunctive relief, compensatory and punitive damages, and attorney fees for acts and/or omissions of Defendants in violation of Plaintiffs' rights to freedom of speech and freedom from unreasonable search and seizure, excessive force, and malicious prosecution, and racial profiling under the First, Fourth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, Article 1, §§ 2, 6, and 21 of the Rhode Island Constitution, and under the laws of the State of Rhode Island and the City of Providence, including common law negligence, assault, battery, and loss of consortium.

## II. Parties

1.      Plaintiff Darryl Jordan ("Mr. Jordan" or "Plaintiff Jordan"), a dark-skinned Black man, was a resident of Rhode Island at the time of the incident that is the subject of this Complaint.

He is the common law husband of Plaintiff Shevon Young.

2.      Plaintiff Shevon Young ("Ms. Young" or "Plaintiff Young"), a light-skinned Black woman, was a resident of Rhode Island at the time of the incident that is the subject of this Complaint.  She is the common law wife of Plaintiff Darryl Jordan.

3.      Defendant City of Providence ("City" or "Defendant City") is a duly authorized and organized municipality under the laws of the State of Rhode Island and is sued by and through its Acting Treasurer, Lance Cardillo, who is the official designated by R.I. Gen. Laws § 45-15-5 to be named in a suit for relief against the City.

4.      Defendant Sean Murnighan ("Defendant Murnighan") is a Providence Police officer.  He is sued individually and in his official capacity as a Providence Police officer.

5.      Defendant Mark Cameron ("Defendant Cameron") was a Providence Police officer at all times relevant to this Complaint.  Upon information and belief Defendant Cameron initiated legal proceedings against Plaintiff Jordan.

6.      Defendant **JOHN DOE # 1** ("Defendant Doe 1") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Defendant Doe 1, wearing regular police uniform shirt and no riot gear, was the first officer to seize Plaintiff Jordan and is pictured in **Exhibit 1.**  Defendant Doe 1 is sued individually and in his official capacity as a Providence Police officer.

7.      Defendant **JOHN DOE # 2** ("Defendant Doe 2") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Defendant Doe 2, in a white shirt indicating a supervisory position, joined Defendant Doe 1 in seizing and using excessive force on Plaintiff Jordan and is pictured in **Exhibit 2**.  Defendant Doe 2 is sued individually and in his official capacity as a Providence Police officer.

8.     Defendant **JOHN DOE # 3** ("Defendant Doe 3") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Defendant Doe 3, wearing riot gear, joined Defendant Does 1 and 2 in seizing and using excessive force on Plaintiff Jordan and is pictured in **Exhibit 3**.  Doe 3 is sued individually and in his official capacity as a Providence Police officer.

9.     Defendant **JOHN DOE # 4** ("Defendant Doe 4") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Defendant Doe 4, wearing riot gear, joined Does 1, 2 and 3 in seizing and using excessive force on Plaintiff Jordan.  Defendant Doe 4 is sued individually and in his official capacity as a Providence Police officer.

10.     Defendant **JOHN DOE # 5** ("Defendant Doe 5") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Defendant Doe 5, wearing riot gear, joined Does 2 and 6 in seizing and using excessive force on Plaintiff Young.  Defendant Doe 5 is sued individually and in his official capacity as a Providence Police officer.

11.     Defendant **JOHN DOE # 6** ("Defendant Doe 6") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Defendant Doe 6, wearing riot gear, joined Does 2 and 5 in seizing and using excessive force on Plaintiff Young.  Defendant Doe 6 is sued individually and in his official capacity as a Providence Police officer.  *See* **Exibit 3.**

12.     Defendant **JOHN DOE # 7** ("Defendant Doe 7") upon information and belief is a Providence Police official holding the rank of Lieutenant or above who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Defendant Doe 7,

wearing a white shirt and dark coat, stood and watched as Defendant Does 2, 3, and 4 beat and kicked Plaintiff Jordan. Defendant Doe 6 is sued individually and in his official capacity as a Providence Police officer.

13.     Defendant **JOHN DOE # 8** ("Defendant Doe 8") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence. Defendant Doe 8, together with Defendant Doe 9, effectuated the arrest of Plaintiff Jordan. Defendant Doe 8 is sued individually and in his official capacity as a Providence Police officer.

14.     Defendant **JOHN DOE # 9** ("Defendant Doe 9") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence. Defendant Doe 9, together with Defendant Doe 8, effectuated the arrest of Plaintiff Jordan. Defendant Doe 8 is sued individually and in his official capacity as a Providence Police officer.

15.     Defendant **JOHN DOE # 10** ("Defendant Doe 10") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence. Defendant Doe 10, together with Defendant Does 8 and 9, participated in putting Plaintiff Jordan into the police transport van. Defendant Doe 10 is sued individually and in his official capacity as a Providence Police officer.

16.     Defendant **JOHN DOE # 11** ("Defendant Doe 11") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence. Upon information and belief, Defendant Doe 11 participated in the seizure and arrest of Plaintiff Jordan. Defendant Doe 11 is sued individually and in his official capacity as a Providence Police officer.

17.    Defendant **JOHN DOE # 12** ("Defendant Doe 12") is a Providence Police officer who participated in police response to protests on June 1, 2020 in the downtown area of Providence.  Upon information and belief Defendant Doe 12 participated in the seizure and arrest of Plaintiff Jordan.  Defendant Doe 12 is sued individually and in his official capacity as a Providence Police officer.

18.    Defendant Steven Paré ("Defendant Paré" or "Commissioner Paré") was the Public Safety Commissioner for the City of Providence during the events that gave rise to this complaint. Defendant Paré is sued individually.

19.    Defendant Hugh T. Clements ("Defendant Clements" or "Chief Clements") was the Chief of Police for the City of Providence during the events that gave rise to this complaint. Defendant Clements is sued individually.

20.    Defendant Oscar Perez ("Defendant Perez" or "Chief Perez") is the Chief of Police for the City of Providence.  Defendant Perez is sued in his official capacity.

### III. Jurisdiction

21.    This Court has jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 1367, 2201 and 2202.

### IV. Venue

22.    Venue is proper in this Court since, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims occurred in the District of Rhode Island.

## V. Material Facts

### *Protest at Providence Place Mall*

23.     On the evening of June 1, 2020, protests erupted in Providence, Rhode Island as they had in cities around the United States and indeed the world in the wake of the murder of George Floyd by Minneapolis police officer Derek Chauvin on May 25, 2020.

24.     In Providence, the protest on June 1, 2020, began partly in response to a social media post made by a group of white youth from Warwick calling for a protest beginning at midnight at the Providence Place Mall on Francis Street ("the Mall").

25.     Despite its origins with white youth from a predominantly white city, the post circulated heavily among Black, Latino, and Southeast Asian youth in Providence and adjacent Black and brown communities.

26.     By approximately 10:00 p.m., around twenty youth at most were across Francis Street from the Mall, sitting or walking in small groups or alone.

27.     Within less than thirty (30) minutes, the number of people circulating on the sidewalk in front of the Mall and across Francis Street from the Mall had grown dramatically to approximately two hundred people.  In addition to Black, brown, and white youth, a number of adults were now present, including social service providers, elected officials, and parents.

28.     As people gathered for the protest, the Providence police deployed dozens of officers who formed lines on the sidewalk in front of the Mall.

29.     With the assistance of Rhode Island State Police, Providence police blocked the length of Francis Street between the State House and the intersection with Memorial Drive and the entrance ramps to Interstate 95.

30.    Approximate fifty (50) to one hundred (100) individuals entered the Mall, which was closed for the night.  Providence Police pursued those individuals and arrested several as they cleared the Mall of all trespassers.

31.    As they were pursuing individuals who had entered the Mall, police also knocked to the ground and/or arrested several individuals who did not enter the Mall but were simply on a public sidewalk in front of the Mall.

32.    Police quickly became more aggressive.  Without issuing any order to disperse, they plowed into and began arresting individuals who were gathered on the sidewalk on the western side of Francis Street in front of the Mall and had not entered the building.

33.    Police then took a position on the sidewalk, cleared the sidewalk in front of the Mall, and occupied the middle of Francis Street.

34.    Protesters and observers alike, now numbering approximately three hundred (300) people, were pushed to the sidewalk and grassy area on the eastern side of Francis Street, across the street from the Mall.

35.    Police began deploying oleoresin capsicum ("OC") spray, a chemical weapon banned by the Geneva convention,[1] using handheld canisters at close range and OC grenades shot from military style launchers.

36.    Many protesters, particularly Black and brown youth, engaged in passionate commentaries addressed toward the officers, denouncing the violence, racism and lack of accountability that led to the murder of George Floyd and other Black people across the country.

---

[1] The Geneva Convention, Article II (7) of the 1993 Chemical Weapons Convention defines the category of chemical weapon known as a "Riot Control Agent" as: "Any chemical not listed in a Schedule, which can produce rapidly in humans sensory irritation or disabling physical effects which disappear within a short time following termination of exposure." Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction, Paris, 13 January 1993, Article II (7).

37.    A small number of individuals threw plastic water bottles in the direction of police, and a few of the hundreds of protesters threw small stones toward police.

38.    After the Mall was cleared and the crowd had moved across the street and away from the Mall, police opened up the barricade of Francis Street to allow a box truck to pass through. The box truck contained plastic shields, helmets, and other military equipment that police distributed throughout their troops.

39.    At some point after midnight, a police car, which was left abandoned on the east side of Francis Street, was set on fire.

40.    At the time Providence police distributed riot gear to its officers, the protest had stabilized; most protesters were across Francis Street and on the grassy area south of the train station, while some started wandering off.

41.    Nonetheless, as the crowd began to disperse on its own, Providence police again fired canisters of "OC spray" directly into the crowd.  The crowd dispersed, and people wandered off on foot and in cars in all directions.

### Aftermath of the Protest at the Mall

42.    During this phase of the protest, many individuals broadcast footage of the events on social media, and the postings spread widely throughout the community.

43.    With the COVID pandemic and resulting quarantine having started in March, 2020, the force of social media for real-time communication and news consumption grew significantly in many sectors of society.

44.    As protests grew around the country, in the wake of the police murder of George Floyd and the recent deaths of other Black people at the hands of police and white vigilantes, social

media came to play an increasingly important role in documenting this youth-led movement and the sometimes violent and constitutionally offensive responses by police.

45.     Mr. Jordan and Ms. Young saw live stream video of the protest and police activity on social media outlets and became deeply concerned as the tension level appeared to increase.

46.     Plaintiffs, already concerned that there did not appear to be enough (non-police) adults present on scene to keep everyone safe, decided to head to downtown Providence when they first saw images of the police car set on fire.

47.     Mr. Jordan and Ms. Young are both artists, and parents.  Mr. Jordan is a musician and recording artist and Ms. Young is filmmaker and visual artist, who has had formal training in video and audio production.

48.     Both Plaintiffs have children in the same age range as the teenagers and young adults they saw present—first at the protest and then later, dispersed throughout downtown.

49.     Plaintiffs were especially concerned that even with the large volume of video circulating on social media, they did not see interviews or other commentary or reflective depictions of what was happening, or why.

50.     As artists and community workers, both Ms. Young and Mr. Jordan felt a deep sense of responsibility for the safety of the many young people from their community who were at the scene of the protest and in danger of physical harm.

51.     Since they did not have access to a car, Ms. Young and Mr. Jordan decided to walk the two miles from where they lived at the time in East Providence to downtown Providence to engage in this critical community journalism project.

52.    Ms. Young and Mr. Jordan approached downtown from the direction of Fox Point, arriving at the southern end of Dorrance Street near Garrahy Judicial Complex at about 12:30 a.m. on June 2, 2020.

53.    By the time Plaintiffs arrived downtown, the protest had already been dispersed from the area near the Mall and most of the police had already cleared the site, eventually regrouping in the vicinity of City Hall.

54.    Using their telephones, Mr. Jordan and Ms. Young filmed as they walked up and down Dorrance Street, circling around the blocks of Weybosset Street, Westminster Street, and the area south of Kennedy Plaza.

55.    Plaintiffs' goal being at the protest that night was to document the activity and where possible, the voices of young Black and brown people most deeply affected by police violence and at the center of the protest that night.

56.    However, during the twenty-two minutes that they filmed and walked, Ms. Young and Mr. Jordan saw few civilians and no police on foot.  Vehicular traffic was moderate, higher than usual for a Monday night/Tuesday morning in downtown Providence.

57.    After seeing enough tension in the video feeds to prompt them to walk two miles from East Providence, Plaintiffs were pleasantly surprised to observe no negative conduct on the part of police or civilians as they monitored the scene.

58.    Lacking subjects to interview, Ms. Young and Mr. Jordan provided their own commentary, analyzing the larger social forces and history that lay behind the social unrest.

59.    Pointing out that young people were the majority of people present downtown, Ms. Young called on her audience to "pray for us, pray for our kids."

60. Ironically, at one point as the couple circled, Ms. Young voiced a "salute to Providence cops," noting that the police "ain't brutalizing us, they ain't shooting us with no gas. They ain't got no fucking shields, they ain't beating our kids."

61. Minutes later, Plaintiffs heard loud popping sounds and saw police cars and commotion ahead. Although Ms. Young was determined to film the activity possibly involving police and youth, she turned back when OC spray from nearly a block away made her eyes burn and her breathing labored.

62. Apparently, police had used military-style launch devices to deploy OC grenades into a cluster of five to ten civilians ahead.

63. Plaintiffs were forced to move farther from the chemical weapon as it drifted in the wind to surrounding blocks, and a young person who walked past them gave Ms. Young water to rinse her eyes.

64. Aside from the OC spray, Mr. Jordan and Ms. Young had seen no contact between police and civilians, no acts of vandalism occurring, no objects being thrown, and no groups larger than a few people.

65. Eventually Plaintiffs made their way to Kennedy Plaza, where they recorded an interview with a twenty-five-year-old mother of two.

66. Moments after concluding the interview, Plaintiffs saw a phalanx of about twenty officers in riot gear, carrying three-foot clubs and plastic shields, amass in front of City Hall.

67. Mr. Jordan and Ms. Young watched with concern as six to ten of these heavily militarized local police officers jogged in formation away from City Hall and toward Burnside Park.

68.   Shots rang out, and Mr. Jordan and Ms. Young realized that police were firing what appeared to be rubber bullets at unarmed civilians across Dorrance Street from City Hall.

69.   Plaintiffs watched in horror as individual officers ran after one youth at top speed, taking him to the ground when they caught him and bringing their clubs down on him.

70.   Ms. Young became distraught, sobbing and crying out that "these are babies!"

71.   Mr. Jordan held his wife back, speaking softly and trying to calm her as she screamed and sobbed at the horrific scene.

72.   As Plaintiffs stood on Kennedy Plaza and took a few moments to compose themselves, two police in riot gear crossed Washington Street and passed close by to Plaintiffs' left.

73.   At least a dozen more officers in riot gear followed, walking briskly toward Memorial Drive and Exchange Terrace.

74.   As Mr. Jordan and Ms. Young watched, a voice called out instructing the officers to move "single file" to Memorial (Boulevard), in the direction of the Mall.  The officers began marching in single file toward the Mall.

75.   Plaintiffs discussed whether the risk of remaining downtown in order to document the activity was too great and decided to stay, still concerned for the youth and their safety.

76.   Mr. Jordan and Ms. Young walked through Burnside Park toward Exchange Terrace.

77.   At Exchange Terrace, Ms. Young saw police clustered to their left, on the southern side of Exchange Terrace, and called out to Mr. Jordan to move to the other side of the street, as she was "not trying to walk up on them."

78.    Plaintiffs crossed Exchange Terrace, and paused on the sidewalk, approximately fifty (50) yards east of the old Union Station, on the same side of the street as the old train station.

79.    The group of police whom Plaintiffs were attempting to avoid crossed Exchange Terrace right after Mr. Jordan and Ms. Young did, ending up on the same side of the street as Plaintiffs, about thirty (30) yards closer to the Mall.

80.    From the direction of the group of the officers, a young man jogged toward Plaintiffs, his body positioned sideways and his hands in the air.

81.    Mr. Jordan and Ms. Young heard the young man taunting police as he was moving, turning back to look at them and yelling derogatory comments toward them.

82.    Three police officers in riot gear took a few steps toward the young man and paused.

83.    Mr. Jordan, who had been standing in the middle of the sidewalk, quickly stepped back toward the street as the young man rushed past them.

84.    Ms. Young was in the middle of the sidewalk filming as the young man passed, urging him to move on, as his comments were only likely to antagonize police in an already-tense situation.

### The Assault

85.    After Ms. Young called out to the youth to just go and to get behind her, the young man, still running, yelled "(N-word)s is straight bitch!  Fuck all of you!"

86.    Immediately the three officers closest to Ms. Young and Mr. Jordan, who had remained in place for close to six seconds, began to march and then jog toward the youth who had been taunting them.

87.    Mr. Jordan and Ms. Young remained motionless as the officers approached.

88.     Ms. Young was in the middle of the sidewalk, filming, when she realized that the officers were picking up momentum and now running toward her, and that she would not be able to move out of their way in time.

89.     Hoping to avoid any antagonism with the police, she called out "I'm not doing anything wrong!" Whether or not they heard her, the officers ran right past the light-skinned woman as if she were not there.  *See* **Exhibit 4.**

90.     Mr. Jordan, a dark-skinned man, was less fortunate.

91.     Defendant John Doe 1, shorter and white, with a round face and no hat or helmet, was in a cluster of officers directly behind the three who had first followed the youth.  *See* **Exhibit 1.**

92.     As Defendant Doe 1 came within approximately five (5) to seven (7) feet of Mr. Jordan, Defendant Doe 1 looked toward Mr. Jordan, who was still motionless, and suddenly veered to his right, reaching forward with his right arm as if to grab Mr. Jordan.  *See* **Exhibit 4.**

93.     Defendant Doe 2, taller, white, and in riot gear including a vest marked "police" on the front and the short-sleeved white uniform shirt customarily worn by supervisors, picked up his pace and joined Defendant Doe 1 as he rushed at Mr. Jordan.

94.     Defendants Doe 1 and Doe 2 tackled Mr. Jordan, although he had made no movements and uttered no words to the officers, had only stood in place not in the way.

95.     As soon as he fell, Mr. Jordan curled into a fetal position to protect himself from the three-foot wooden clubs the officers wielded.

96.     Nonetheless, Defendants Doe 1 and Doe 2, now joined by Defendants Doe 3 and Doe 4, brought their clubs down on Mr. Jordan, with one blow striking him so hard on his forehead that he could neither see nor hear clearly.

97.     Defendant Does 1-4 continued beating and kicking Mr. Jordan.  One of the officers pressed his knee into Mr. Jordan's back, making it difficult for him to breathe.

98.     Terrified for her husband's life, Ms. Young began screaming and begging for the police to stop as she attempted to shield him with her body.

99.     Defendant Doe 2, joined by Defendants Doe 5 and Doe 6 used their riot shields to push Ms. Young away from her husband.  *See* **Exhibit 5.**  The first shove sent her flying off the sidewalk and all the way into the far lane of traffic.

100.     Ms. Young somehow managed to stay on her feet and not get run over by a car, but could not convince the officers to let Mr. Jordan go, nor even to let her see if he was ok.

101.     The police communicated no order to move nor any other type of order to Plaintiffs before running at Mr. Jordan and tackling him to the ground.

102.     There was no apparent explanation for why Defendants tackled and beat Mr. Jordan, other than the fact that Plaintiff Jordan, who was standing still on the edge of the sidewalk, was easier to catch than the younger Black man who had been taunting them and had a running start.

103.     Defendant Doe 7, in a supervisor's white shirt and wearing a dark coat, stood by and watched as officers beat and arrested Mr. Jordan.  *See* **Exhibit 6.**

104.     Defendant Doe 8, who appeared to Ms. Young to be Asian, together with Defendant Doe 9, arrested Mr. Jordan.

105.     Mr. Jordan remained lying on the ground until Defendants Doe 8 and Doe 9 picked him up and sat him on the sidewalk.

106.     As soon as Mr. Jordan sat up, blood started flowing even faster from the wound inflicted to his head by the club-wielding officers.

107.    Fifteen to twenty minutes passed until the police prisoner transport van arrived. Defendant Does 8-10 pulled Mr. Jordan to his feet and put him in the back of the van.

108.    Mr. Jordan felt like a rag doll, disoriented and weak, as he was lifted into the van. His head was pounding, and he could feel two knots already forming, a large one on his forehead and another on the side of his head.

109.    Providence Police held Mr. Jordan and the other scores of arrestees in the cell block at the Providence Public Safety Complex.

110.    Mr. Jordan was bleeding profusely throughout the rest of the night from the head wound that Defendants inflicted on him, prompting multiple other arrestees in the cellblock to express concern for his medical condition.

111.    Nonetheless, Defendants never offered nor provided medical treatment.

### *Malicious Prosecution*

112.    Mr. Jordan and sixty-four (64) other people arrested that night were brought to Rhode Island District Court, Sixth Division for arraignment later that morning of June 2, 2020.

113.    Defendants charged Mr. Jordan with R.I. Gen. Law § 11-45-1(a) Disorderly Conduct, and Defendant City alleged at arraignment that Mr. Jordan had been in the middle of the street blocking traffic, a patently false accusation.

114.    The only documentation Defendants used to prosecute Mr. Jordan was an arrest report listing him and thirty-one (31) of other people arrested that night, each of them charged with one count of disorderly conduct.

115.    Of the thirty-two arrestees listed on Mr. Jordan's police report, Plaintiff was the oldest at age forty-three (43).  Twenty-seven of the people charged (84%), according to this police

report, were twenty-four (24) years old or younger; twenty-one (21) of them (66%) were twenty-one years old or younger.

116.    Of the thirty-two (32) arrestees listed on Mr. Jordan's police report, fifteen (15) were white and seventeen (17) were Black.

117.    The only allegation included in the arrest report is a brief typed narrative applying to all thirty-two (32) people charged, upon information and belief written by Defendant Murnighan, that reads as follows:

> On 06/01/23, at approximately 2200 hours, Providence Police began to patrolling (sic) the area of Providence Place Mall due to multiple postings on social media of large groups gathering to riot and loot stores and businesses at the Providence Place Mall and the surrounding Downtown Area. Between 2200 hours on 06/01/2020 and 0500 hours on 06/02/2020, Police observed hundreds of protestors taking over Francis Street, completely blocking the road which would not permit access for passing vehicles. Police observed multiple subjects that began to show violent and tumultuous behavior by throwing bottle (sic) and rocks in the direction of Police and Police Vehicles. Police observed the protestors yelling and screaming profanities promoting excessively loud and violent behavior in a public place that would disturb a person of average sensibilities. As Protestors turned to rioting and encouraged looting Police attempted to disperse the crowd. Police made several attempts using loud verbal commands to disperse the crown advising the protesters if the crowd did not disperse arrests would be made. Following the multiple attempts to disperse the crown the following subjects were taken into Police custody and transported to Central Station where they were held and charged with Disorderly Conduct.

118.    Defendant Cameron, who upon information and belief was handling arraignments in District Court on behalf of the City of Providence the morning of June 2nd, made false and generalized allegations that Mr. Jordan had committed the criminal offense Disorderly Conduct as charged, without providing any facts whatsoever specific to Mr. Jordan.

119.    Despite the total lack of any particularized allegation of criminal conduct on the part of Mr. Jordan, the Hon. Magistrate Justice J. Patrick O'Neill ordered Mr. Jordan held on a $1,000 surety bail, as he did with dozens of the people arrested in the previous night's sweep.

120.    Surety bail for victimless misdemeanor charges against a defendant who is neither on bail nor probation was a rare occurrence at Rhode Island District Court arraignments in 2020, and remains so today.

121.    Following arraignment, Ms. Young was not given an opportunity to make bail arrangements at Sixth Division District Court; thus Mr. Jordan along with the other arrestees was brought to the Adult Correctional Institution ("ACI") pending payment.

122.    At the ACI, Mr. Jordan and four others in the group were selected and forced to strip naked and shower in front of other people.

123.    Ms. Young went immediately from District Court to the Intake Service Center at the ACI, with one hundred dollars ($100) representing the ten percent payment required toward Mr. Jordan's surety bail.

124.    The Intake Service Center accepts bail payments until seven p.m. and maintained that schedule on June 1, 2020; Ms. Young arrived at approximately 5:30 p.m.  Staff at the Intake Service Center told Ms. Young that they could not accept payment yet as the bus from the courthouse was only then arriving and Mr. Jordan had not been processed.

125.    Because of the high number of misdemeanor surety bails set in District Court that morning, an unusually large number of people soon arrived to post bail for their loved ones.

126.     Ms. Young waited patiently in the parking area at the Intake Service Center, grateful for other local artists, who showed up to offer support for Mr. Jordan.  Still concerned for the youth

who had been protesting, she let other community members, many of whom were parents there for their children, enter ahead of her rather than pushing to compete for a place in line.

127.    Shortly before 7:00 p.m., ACI staff announced that they were closing the bail payment window and refused to let the dozens of people waiting, including Ms. Young, post bail and secure their loved ones' release that day.

128.    The explanation the ACI staff provided for the refusal to allow more people to pay bail was that the City of Cranston had put a broad curfew in place that forbid the populace to be outdoors after 7:00 p.m. with only a few exceptions.

129.    Mr. Jordan was not released until Ms. Young was able to post his bail when she returned the following day, June 3, 2020.

130.    The protest arrestees were not provided dinner at the ACI the night they arrived; instead, they were each given a ham sandwich and a piece of fruit.  Mr. Jordan does not eat ham; thus, the only food he was provided during the thirty-plus hours he was in custody was a fruit roll-up at the Providence police station that morning, and the piece of fruit at the ACI that night.

### *Damages*

131.    Mr. Jordan returned to court seven times before Defendant City finally dismissed the charges against him under Dist. Ct. R. Cr. P. 48(a) on February 11, 2021.

132.    For eight months, Mr. Jordan's liberty was restricted by the conditions of his bail, including the requirement that he seek permission from the court through a formal motion in order to leave the state of Rhode Island and set foot in Massachusetts, Connecticut, or any other location.

133.    For months, the City refused to dismiss the charges against Mr. Jordan unless he paid a "contribution" of $250 to the Victims of Crime Indemnification Fund managed by the Rhode Island General Treasurer.

134.    Given that Defendant City had no particularized allegations of criminal activity against Mr. Jordan, much less evidence of illegal conduct, Defendant's insistence on a quid-pro-quo before dismissing the charge against Mr. Jordan was a pathetically transparent attempt to curtail Plaintiff's ability to defend his constitutional rights in a civil context.[2]

135.    Mr. Jordan came home from the ACI to find all of the couple's possessions thrown into the parking lot of the apartment building, the result of an illegal eviction by Rich Watrous ("Mr. Watrous") that itself was a direct response to Defendants' illegal arrest.

136.    Mr. Watrous, who had provided Plaintiffs living space in an art facility in East Providence in exchange for labor, told them that due to the arrest he was cancelling the couple's living arrangement effective immediately.

137.    The illegal arrest followed by eviction happened in the fourth month of the COVID pandemic, and housing insecurity in the Providence Metropolitan Area was approaching the worst period in recent history.  None of the couple's family or friends had extra room where Plaintiffs could stay; thus Mr. Jordan and Ms. Young had to choose between renting a hotel room or living outdoors.

138.    For the next several months, Plaintiffs stayed on couches or outdoors when they could, but were usually forced to rent hotel rooms, borrowing and begging for help from the community to come up with the thousands of dollars needed to put a roof over their heads during that time.

---

[2] At the time Defendants prosecuted Mr. Jordan, the United States Supreme Court had not yet issued its ruling in *Thompson v. Clark*, ending a Circuit split by holding that the "favorable termination" element for a malicious prosecution claim under the Fourth Amendment merely requires that there not be a conviction.  142 S.Ct. 1332, 596 U.S. ___ (2022).  Under First Circuit law at the time, the "contribution" the City demanded would have effectively foreclosed Mr. Jordan's malicious prosecution claim.

139.    When Defendant Does 1, 2, and/or 3 battered Mr. Jordan's skull with wooden clubs, they caused a Traumatic Brain Injury (TBI), leaving him not only bleeding profusely from the wound, but also severely concussed.

140.    Finding himself homeless after his release from the ACI, and with a pending criminal case to worry about, Mr. Jordan tried to ignore the pounding headaches as long as he could.

141.    On June 10, 2020, more than a week after Defendants beat his skull with their wooden clubs, Mr. Jordan could no longer tolerate the pain and sought help at the Miriam Hospital Emergency Department.

142.    The health care providers at Miriam diagnosed Mr. Jordan with a concussion, and referred him to the Lifespan Concussion Clinic, where he was seen on July 2, 2020, by Dr. Caroline Sizer, MD/FAAPMR ("Dr. Sizer").

143.    Dr. Sizer, a board-certified brain injury medicine physiatrist, started Mr. Jordan on a program of intensive physical therapy to address the symptoms of the concussion.

144.    Despite being homeless and without transportation, Mr. Jordan, with support from Ms. Young, managed to continue his physical therapy visits throughout July and August.

145.    As the days and weeks progressed from the time Defendants beat him, both Plaintiffs observed a marked decrease in Mr. Jordan's ability to concentrate or complete simple tasks.

146.    At the time of this Complaint, Mr. Jordan still suffers from headaches, memory impairment, poor concentration, and photosensitivity as the result of the blow to his head.

147.    As a result of these physical and cognitive challenges, Mr. Jordan was unable to write or produce music at the level he had before the brain injury, thus losing full access to his core intellectual, emotional, and spiritual activity.

148.    With Mr. Jordan unable to function at full capacity, Ms. Young took on the duties of scrambling to find money to pay for hotel rooms, coordinating medical appointments, and managing the tasks of daily living for the couple.

149.    With their personal and professional lives severely disrupted, Plaintiffs eventually moved to Cincinnati, Ohio to stay with family there and to rebuild their emotional and financial well-being.

150.    Ms. Young began the process of moving hundreds of miles away to Cincinnati, Ohio during the fall and winter months of 2020-21; Mr. Jordan was unable to leave due to the open criminal case and did not join his wife there until spring of 2021.

### *Municipal Liability for Fourth Amendment Violations*

151.    As described herein, Defendant City's police apparently were and currently remain unaware of the constitutionally protected rights of individuals to be free from illegal search and seizure, including freedom from excessive force.

152.    On information and belief, this lack of awareness is widespread among Defendant City's police officers.

153.    On information and belief, based on curriculum used by Defendant City at the Providence Police Training Academy ("the Academy") over multiple years in addition to sworn testimony, of eight hundred plus (800+) hours of Academy training, only three (3) to thirteen (13) hours are spent on training in anything remotely relevant to understanding, respecting, and protecting the civil and constitutional rights of the people.

154.     On information and belief, Defendant City provides no additional training to its police officers in the topics described *supra* during their entire tenure with Defendant City's Police Department.

155.     This lack of knowledge on the part of officers has continued despite a series of recent lawsuits in which the Defendant City has been sued for the same or similar Fourth Amendment and free speech violations.  *See e.g. Reilly v. Providence*, No. CA 10-461 S, 2013 WL 1193352 (D.R.I. Mar. 22, 2013); *Prince v. Providence*, C.A. No. 15-378M (D.R.I); *Kurland and Gould v. Providence*, C.A. No. 14-0524-WES-PAS (D.R.I); *Pombo v. Providence*, C.A. No. 1:15-cv-00291-ML-LDA (D.R.I); *Kurland v. Providence*, C.A. No. 18-cv-00440-MSM-LDA; *Davis v. Providence,* C.A. No. 21-cv-00490-JJM-LDA; *Murphy v. Providence*, C.A. No. 22-cv-00115-WES-PAS.

     a.     Four of these civil actions resulted not only in settlements but in either consent decree, stipulation, or new departmental policies outlining proper constitutional limits to policing of protesters and/or civilians exercising their First Amendment rights.

     b.     On information and belief Defendant City has not used any formal mechanism to inform its officers of the outcomes of these specific cases or others alleging constitutional violations in the Providence police conduct themselves.

156.     Per the sworn testimony of Defendant City police officers, Defendant City, Defendant Clements, and Defendant Paré during their tenure as Police Chief and Public Safety Commissioner, respectively, took no action to properly supervise, discipline, and/or notify, educate, and/or train City police officers relative to the rights of citizens to peaceably exercise First Amendment rights in public forums such as streets, sidewalks, and parks without law enforcement or other governmental interference.

157.    Defendant City failed to properly select, train, instruct, supervise and/or discipline officers in the City Police Department, including Defendants Murnighan, Cameron, Perez, and Does 1 through 12, relative to the constitutionally protected right of people to peaceably assemble and/or exercise other Fourth and/or First Amendment rights on public sidewalks and in other public forums.

158.    Upon information and belief, the conduct of individual Defendants described herein was a direct consequence of paramilitary operations plans and directives created and approved by Defendant City policymakers including Defendant Paré and Defendant Clements.

159.    As is apparent by the disturbing regularity of such events, a custom or policy exists in the City Police Department wherein the Defendant City has acquiesced to, permitted, condoned and/or encouraged the deprivation of the constitutionally protected right of people to peaceably assemble and/or exercise other Fourth and/or First Amendment rights on public sidewalks and in other public forums.

160.    The Defendants knew or should have known that arresting Plaintiff Jordan, and otherwise interfering with the Plaintiffs' peaceful assembly on a public sidewalk, particularly where there was no obstruction of the sidewalk, was unlawful under the circumstances based on well settled law.

161.    Despite such knowledge, the Defendants, by and through their policy-making officials and agents, approved, acquiesced to, condoned, intentionally ignored, or were deliberately indifferent to such practice, and failed to change or eliminate such unlawful custom or policy.

***Municipal Liability for Equal Protection Violations***

162.    Defendant City was clearly on notice well before June 1, 2020 as to its pattern and practice of arresting and using force against Black people at disproportionate rates far in excess of Defendant City's Black population.

163.    The Providence Police Office of Professional Responsibility ("OPR"), which oversees the civilian complaint process, reported as far back as 2015 that 39% of recorded Use of Force incidents were against Black people, despite the fact that Providence's population at the time was about 13% Black and similar patterns continued in subsequent years.

164.    Sworn testimony by (now) Chief of Police Defendant Perez confirms that as of December 3, 2020, there was no known review of or response to those numbers by Defendant City.

165.    Defendant Paré was at the scene of the protests and police deployment the night of June 1, 2020, in his capacity as the Public Safety Commissioner of the City of Providence.

166.    Upon information and belief, Defendant Clements was at the scene of the protests and police deployment the night of June 1, 2020 in his capacity as the Chief of Police of the City of Providence.

167.    Supervisory-level Providence Police officers, identified by their white shirts, witnessed and/or participated in the unconstitutional arrest and beating of Plaintiff Jordan on June 2, 2020.

***Respondeat Superior Liability***

168.    Defendant City is liable under the doctrine of *respondeat superior* for the negligent acts/or omissions of their agents, including each and every individual Defendant, each police officers employed by Defendant City Police Department and under the direct supervision of Defendants Paré, Clements, Perez, and supervisor-level Defendants Doe 2 and 7, whose acts and/or

omissions within the scope of their employment were the proximate cause of the serious injuries suffered by the Plaintiffs.  R.I. Gen. Laws § 9-31-1.

*Preparation for Litigation*

169.    On October 8, 2022, Plaintiffs sent a Notice of Claim to the Claims Committee of the Providence City Council, pursuant to R. I. Gen. Laws §45-15-5.

170.    Plaintiffs' attempts to identify Defendants were thwarted by the City. The police report from Mr. Jordan's underlying criminal case that was used to prosecute him and thirty-one (31) other individuals includes no information that could aid in identifying any officers involved in the assault and arrest of Mr. Jordan.

171.    On March 29, 2022, Mr. Jordan, through his attorney Eli Katherine Hadley ("Attorney Hadley"), requested the following items from Defendant Perez, who was then commander of the Administrative Division of the Providence Police Department: "arrest reports, after incident reports, body camera footage, any other video or audio recordings, color copies of any booking photos, any witness statements, and any and all other records related to your arrest of me."  The request was sent via email and copied to Senior Assistant City Solicitor Steven Nelson ("Attorney Nelson").

172.    In an April 2022 phone call with Attorney Hadley, Attorney Nelson stated that it was the City Law Department's position that the City did not need to furnish any records in response to Mr. Jordan's request; however Attorney Nelson agreed to provide the police report.

173.    On September 28, 2022, and again on October 11, 2022, Attorney Hadley wrote to Defendant Perez and Attorney Nelson requesting the police report and noting that under Providence Municipal Ordinance Chapter 18 ½, Section 4(c)(2)(4) an individual has a right to view video footage associated with their stop.

174.    In October 2022, Attorney Nelson provided a redacted version of the police report and suggested that Plaintiff's attorney file a request on the City's website pursuant to the Access to Public Records Act ("APRA"), R. I. Gen. Laws §38-2-1 *et seq.* ("APRA").

175.    On October 22, 2022, Mr. Jordan's attorney sent an APRA request to the Providence Police Department requesting "any and all records" relating to Mr. Jordan's arrest.

176.    The City replied to the APRA request that "[t]here are no BWC, supplemental reports, or witness statements with reference to Darryl Jordan."  The only materials that Defendant City provided was a redacted police report and Mr. Jordan's booking photos.

177.    Despite diligent and reasonable efforts, Plaintiffs have been unable to determine the identities of any of the Defendant Does 1 through 12 who participated in the violations of Plaintiffs' First and Fourth Amendment and State law rights on June 2, 2020.

## VI. Claims for Relief

178.    Plaintiff hereby incorporates into the counts below the allegations contained in all preceding paragraphs (1 through 177) as if fully set forth herein.

### COUNT ONE
*Violation of Plaintiffs' Freedom of Speech Under the First Amendment,*
*Actionable Through 42 U.S.C. § 1983 Against All Defendants*

179.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, denied Plaintiffs their right to freedom of speech as guaranteed under the First Amendment of the United States Constitution, causing Plaintiffs to suffer harm as aforesaid.

## COUNT TWO
### *Denial of Plaintiffs' Freedom of Speech in Violation of Art. I, § 21 of the Rhode Island Constitution*

180.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, denied Plaintiffs their right to freedom of speech as guaranteed under Article I, § 21 of the Rhode Island Constitution, causing Plaintiffs to suffer harm as aforesaid.

## COUNT THREE
### *Excessive Force in Violation of the Fourth and Fourteenth Amendments, Actionable Through 42 U.S.C. § 1983*

181.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, acted unreasonably in arresting Plaintiff, in violation of the Fourth and Fourteenth Amendments of the United States Constitution, causing Plaintiff to suffer harm as aforesaid.

## COUNT FOUR
### *Excessive Force in Violation of Art. I, § 6 of the Rhode Island Constitution*

182.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, denied Plaintiffs their right to freedom from excessive force as guaranteed under Article I, §6 of the Rhode Island Constitution, causing Plaintiffs to suffer harm as aforesaid.

## COUNT FIVE
### *False Arrest in Violation of the Fourth and Fourteenth Amendments, Actionable Through 42 U.S.C. § 1983*

183.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, acted unreasonably in arresting Plaintiff Darryl Jordan without probable cause, in violation of the Fourth and Fourteenth Amendments of the United States Constitution, causing Plaintiff to suffer harm as aforesaid.

## COUNT SIX
### *False Arrest in Violation of Art. I, § 6 of the Rhode Island Constitution*

184.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, acted unreasonably in arresting Plaintiff Darryl Jordan without probable cause in violation of Article I, §6 of the Rhode Island Constitution, causing Plaintiffs to suffer harm as aforesaid.

## COUNT SEVEN
### *Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments, Actionable Through 42 U.S.C. § 1983*

185.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, acted unreasonably in prosecuting Plaintiff Darryl Jordan without probable cause, in violation of the Fourth and Fourteenth Amendments of the United States Constitution, causing Plaintiff to suffer harm as aforesaid.

## COUNT EIGHT
### *Malicious Prosecution in Violation of Art. I, § 6 of the Rhode Island Constitution*

186.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, acted unreasonably in prosecuting Plaintiff Darryl Jordan without probable cause in violation of Article I, §6 of the Rhode Island Constitution, causing Plaintiffs to suffer harm as aforesaid.

## COUNT NINE
### *Violation of Plaintiff's Right to Equal Protection Under the Fourteenth Amendment, Actionable Through 42 U.S.C. § 1983*

187.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, violated Plaintiff Darryl

Jordan's right to equal protection under the law in violation of the Fourth and Fourteenth Amendments of the United States Constitution, causing Plaintiff to suffer harm as aforesaid.

### COUNT TEN
#### *Violation of Plaintiff's Right to Equal Protection Under Art. I, § 2 of the Rhode Island Constitution*

188.   Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, and acting under color of law, violated Plaintiff Darryl Jordan's right to Equal Protection under the law in violation of Article I, §6 of the Rhode Island Constitution, causing Plaintiff to suffer harm as aforesaid.

### COUNT ELEVEN
#### *Common Law Negligence*

189.   Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, failed and/or refused to exercise reasonable care to protect the Plaintiffs from reasonably foreseeable harm, causing Plaintiffs to suffer harm as aforesaid.

### COUNT TWELVE
#### *Common Law Assault*

190.   Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, placed Plaintiffs in reasonable fear of imminent bodily harm, causing Plaintiffs to suffer harm as aforesaid.

### COUNT THIRTEEN
#### *Common Law Battery*

191.   Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, caused unwanted touching of Plaintiffs, causing Plaintiffs to suffer harm as aforesaid.

## COUNT FOURTEEN
### *Common Law False Arrest / False Imprisonment*

192.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, caused Plaintiff Darryl Jordan to held against his will without legal justification.

## COUNT FIFTEEN
### *Common Law Malicious Prosecution*

193.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, caused Plaintiff Darryl Jordan to held against his will without legal justification.

## COUNT SIXTEEN
### *Loss of Consortium Under R.I. Gen. Laws § 9-1-41*

194.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, caused tortious injuries to Plaintiff Darryl Jordan thus causing a loss of consortium to his common-law wife Plaintiff Shevon Young.

## COUNT SEVENTEEN
### *Racial Profiling in Violation of R.I. Gen. Laws § 31-21.2-1, et seq.*

195.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, improperly relied on race and color in suspecting that Plaintiff Darryl Jordan had committed or was about to commit a crime in violation of the "Comprehensive Community-Police Relations Act."

## COUNT EIGHTEEN
### *Racial Profiling in Violation of § 18 ½ -4(b) of the Providence Code of Municipal Ordinances*

196.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, improperly relied on race and color in suspecting that

Plaintiff Darryl Jordan had committed or was about to commit a crime in violation of the "Providence Police Community Relations Act" (commonly known as the Community Safety Act).

## VII.  Prayers for Relief

WHEREFORE, Plaintiffs hereby pray that this Court grant the following relief:

1. A declaratory judgment that the Defendants, in the manner described herein, violated the First, Fourth and Fourteenth Amendments to the United States Constitution and Article 1, §§2, 6, and 21 of the Rhode Island Constitution by violating Plaintiff's rights to freedom of speech, to be free from unreasonable seizure, and to have Equal Protection under the law, and that Defendants violated the statutory and common law of the State of Rhode Island.

2. An award of compensatory damages;

3. An award of punitive damages as allowed by law;

4. An award of pre- and post-judgment interest on all sums recovered, and an award of reasonable attorney's fees, expenses and costs of litigation to Plaintiff pursuant to 42 U.S.C. § 1988 and/or R.I. Gen. Laws § 31-21.2-4.

5. Such other and further relief as this Court deems just and proper.

## VIII. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX. Designation of Trial Counsel

Plaintiff hereby designates Shannah Kurland, Esquire, as trial counsel.

Plaintiffs,

**DARRYL JORDAN**
**SHEVON YOUNG**

by and through their attorney

/s/ *Shannah Kurland*
Shannah Kurland, Esq. #9186

SINAPI LAW ASSOCIATES
2374 Post Road, Suite 201
Warwick, RI 02886
401-739-9690
smk@sinapilaw.com